**IN RE DELTA/AIRTRAN BAGGAGE FEE ANTITRUST LITIGATION**

**CIVIL ACTION FILE No. 1:09-md-2089-TCB**

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed July 12, 2016

## ORDER

Timothy C. Batten, Sr., United States District Judge

The factual allegations giving rise to this multidistrict litigation have been described at length in the Court's prior orders and will be restated here only briefly. In December 2008, Defendants AirTran Airways, Inc. and Air-

Tran Holdings, Inc. (collectively, "AirTran")[1] and Defendant Delta Air Lines, Inc. began charging a fee to passengers for a first checked bag. Plaintiffs filed thirteen class-action complaints alleging that this first-bag fee was the product of a price-fixing conspiracy between Defendants that violated § 1 of the Sherman Act.[2] According to Plaintiffs, neither airline could unilaterally impose the fee in an open and competitive market without losing customers to the other, so Defendants "used their earnings calls (and other channels) to communicate and coordinate pricing behavior" to ensure that both airlines could impose the fee without losing any market share. Defendants maintain that there was no collusion and that they independently arrived at the decision to impose a first-bag fee.

The thirteen member cases were consolidated into this multidistrict litigation, and the seven remaining Plaintiffs now move for class certification [123] and to exclude the class-certification testimony of four of Defendants' experts [616, 618, 621, 630]. Defendants oppose Plaintiffs' motions and have filed their own motion to exclude the class-certification testimony of Plaintiffs' expert economist [399]. In order to provide the necessary context for the analysis of the evidentiary motions, this Order will begin by reviewing the legal framework governing class certification and the legal standards of the three certification criteria that are most contested in this case. The Court will then analyze the admissibility of the challenged expert testimony, which turns on the relevance of offsetting benefits, and the extent to which Defendants are permitted to raise reimbursement as a defense. Once those recurring issues are resolved, the Court will address each of the Rule 23 requirements in turn to determine whether this case may proceed as a class action.

## I. Governing Legal Standards

### A. Overview of the Class Certification Framework

Pursuant to Federal Rule of Civil Procedure 23, a class action may be maintained only if two conditions are satisfied: the named plaintiffs must be "qualified to represent the members of the class in accordance with the four prerequisites of Rule 23(a), and the action must be one of the three types Rule 23(b) identifies." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir.1987) (internal footnote omitted). Rule 23(a) requires Plaintiffs to show that

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

"These four requirements commonly are referred to as the prerequisites of numerosity, commonality, typicality, and adequacy of representation, and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir.2001) (internal punctuation omitted).

If Plaintiffs can establish that Rule 23(a)'s four requirements are satisfied, they must then show that at least one of the requirements set forth in Rule 23(b) is met. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir.2009).[3] Plaintiffs rely on Rule

---

1. AirTran has since merged with Southwest Airlines and is no longer operating as a separate airline.

2. Other claims initially filed, including a § 2 claim and a claim under § 1 relating to reductions in capacity, have since been dismissed by the Court or expressly abandoned by Plaintiffs, leaving only a § 1 price-fixing claim. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F.Supp.2d 1348, 1366–68 (N.D.Ga.2010) (dis-

missing § 2 claim); [335], ¶ 3 (Plaintiffs' stipulation "that they have abandoned any claim based on a conspiracy to reduce capacity).

3. Rule 23(b)(1)—which allows for certification when separate actions by individual class members would create a risk of inconsistent adjudications or when a judgment in one suit would be dispositive of the interests of the other non-party class members—has never been at issue in this case. Plaintiffs initially suggested that this class

23(b)(3), which provides in pertinent part that a class action may be maintained where it is shown that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

■ In addition to these express requirements of Rule 23, there is an implicit but firm requirement that Plaintiffs must satisfy. "Before a district court may grant a motion for class certification, a plaintiff seeking to represent a proposed class must establish that the proposed class is adequately defined and clearly ascertainable." *Little v. T–Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (internal punctuation omitted).

■ Courts must perform a "rigorous analysis" to ensure that Rule 23's requirements are satisfied before certifying a class. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). This is so even where some of the requirements are not in dispute, *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003), or where it requires the Court to decide disputed questions of fact that bear on the inquiry, *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir.2016). *See also Dukes*, 564 U.S. at 350, 131 S.Ct. 2541 ("Rule 23 does not set forth a mere pleading standard."); *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 1432–33, 185 L.Ed.2d 515 (2013) (reversing certification where district court abstained from considering certain arguments that pertained to both Rule 23 and the merits determination).[4] Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and thus merits questions may be considered "only to the extent" they pertain to the Rule

23 analysis. *Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*, —— U.S. ——, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013).

Finally, it is well settled that the party seeking certification bears the burden of proving that it is appropriate, and there is no presumption in favor of certification, even in antitrust cases. "A district court that has doubts about whether the requirements of Rule 23 have been met should refuse certification until they have been met." *Electrolux*, 817 F.3d at 1233–34 (internal punctuation omitted).

Before examining the evidence and arguments as to each of Rule 23's express and implied requirements, the Court will review the legal standards governing the three criteria that are most contested by the parties: the implied requirement of ascertainability, Rule 23(a)(4)'s adequacy requirement, and predominance under Rule 23(b)(3).

### B. Legal Standard: Ascertainability

"Although not explicit in Rule 23(a) or (b), courts have universally recognized that the first essential ingredient to class treatment is the ascertainability of the class." *Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 663 (N.D.Ala.2010) (emphasis omitted). "A definable class protects absent plaintiffs in two ways—by enabling notice to be provided where necessary and by defining who is entitled to relief; and a definable class protects defendants by enabling a final judgment that clearly identifies who is bound by it." WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 3.1 (5th ed.). The precise contours of the class need not be ascertained before certification so long as the class members can be identified "at some stage of the proceeding." *Karhu v. Vital Pharm., Inc.*, 621 Fed.Appx. 945, 952 (11th Cir.2015) (citing NEWBERG ON CLASS ACTIONS § 3.3).

could be certified under subsection (b)(2), but in light of the intervening Supreme Court opinion in *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011), they have wisely withdrawn that contention. Tr. of 6/21/16 Hr'g at 26; *see also In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 684 n. 6 (N.D.Ga.1991) (denying (b)(2) certification in an airline antitrust case before *Dukes* where despite "injunctive and declaratory aspects of the relief"

sought, "the true nature" of the case was defined by the request for treble damages).

4. "Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir.2008); *accord Teamsters Local 445 v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir.2008).

Although ascertainability is an essential element of class certification, it has also been described as a "slippery" requirement that "does not require an overly strict degree of certainty and is to be liberally applied." *Buford v. H&R Block, Inc.*, 168 F.R.D. 340, 347 (S.D.Ga.1996); *see also Karhu*, 621 Fed.Appx. at 954 (Martin, J., concurring) ("I would like to see our courts continue to clarify the ascertainability doctrine so as not to eradicate the small-dollar consumer class action."). The Eleventh Circuit requires a class definition to "contain[ ] *objective criteria* that allow for class members to be identified in an *administratively feasible* way." *Karhu*, 621 Fed.Appx. at 946 (emphasis added). In this case, there is no dispute that the class is defined with reference to objective criteria. *See generally NOW v. Scheidler*, 172 F.R.D. 351, 357 (N.D.Ill.1997) (explaining that a class definition lacks objective criteria where, for example, "membership is contingent on the prospective member's state of mind").

■ As to the second requirement, "[i]dentifying class members is administratively feasible when it is a 'manageable process that does not require much, if any, individual inquiry.' " *Karhu*, 621 Fed.Appx. at 946 (quoting *Bussey v. Macon Cty. Greyhound Park, Inc.*, 562 Fed.Appx. 782, 787 (11th Cir.2014)); *see also Grimes*, 264 F.R.D. at 665 ("[C]lass certification is not appropriate if the court is called on to engage in individualized determinations of disputed fact in order to ascertain a person's membership in the class.").

■ Of course, that identification of class members should not involve a great extent of individual inquiry "does not suggest that *no* level of inquiry as to the identity of class members can ever be undertaken. If that were the case, no Rule 23(b)(3) class could ever be certified." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3d Cir.2015). As numerous district and circuit courts have recognized, " 'the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification.' " *Id.* (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539–40 (6th Cir.2012)); *see also Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 722 (9th Cir.2010) ("If the size

of a defendant's potential liability alone was a sufficient reason to deny class certification ..., the very purpose of Rule 23(b)(3)—to allow integration of numerous small individual claims into a single powerful unit—would be substantially undermined.") (internal punctuation omitted).

■ A proponent of class certification may rely on the defendant's business records to identify prospective class members, *Bussey*, 562 Fed.Appx. at 788, but it is not enough to simply allege that the defendant's records will allow for identification. "[T]he plaintiff must also establish that the records are in fact useful for identification purposes and that identification will be administratively feasible." *Karhu*, 621 Fed.Appx. at 947 (internal punctuation omitted).

## C. Legal Standard: Adequacy of Representation

■ To satisfy Rule 23(a)(4)'s requirement that Plaintiffs be able to "fairly and adequately protect the interests of the class," Plaintiffs bear the burden of showing, first, that no "substantial conflicts of interest exist between the representatives and the class," and second, that "the representatives will adequately prosecute the action." *Valley Drug*, 350 F.3d at 1189; *see also In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 688 (S.D.Fla.2004) (Rule 23(a)(4) "applies to both the named plaintiffs and to the class counsel.").

It is well settled that "the existence of minor conflicts alone will not defeat a party's claim to class certification." *Valley Drug*, 350 F.3d at 1189. Instead, "a party's claim to representative status is defeated only if the conflict between the representative and the class is a fundamental one, going to the specific issues in controversy." *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir.2000). "A conflict is not fundamental when ... all class members share common objectives and the same factual and legal positions and have the same interest in establishing the liability of defendants." *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir.2010) (internal punctuation omitted); *Telecomm Tech. Servs., Inc. v. Sie-*

*mens Rolm Commc'ns, Inc.*, 172 F.R.D. 532, 544 (N.D.Ga.1997) (Adequacy requirement looks to "[a]ntagonistic interests" among class members creating risk that "one party's interest may be sacrificed for another's.").

■ "Moreover, a conflict will not defeat the adequacy requirement if it is 'merely speculative or hypothetical.'" *Ward*, 595 F.3d at 180 (internal punctuation omitted). "Potential" conflicts of interest are likewise insufficient to defeat certification; instead, a district court should continue to monitor the matter going forward and may "revisit the issue and de-certify the class if a true conflict ever manifested." *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 113 (E.D.N.Y.2012); *see also* FED. R. CIV. P. 23(c)(1) (Class certification order "may be altered or amended before final judgment.").

### D. Legal Standard: Predominance

Rule 23(b)(3) allows for certification of class actions only when it is shown that common questions predominate over individual ones. Predominance is "perhaps the central and overriding prerequisite for a Rule 23(b)(3) class." *Vega*, 564 F.3d at 1278. Plaintiffs must show that "the issues in the class action ... are subject to generalized proof and thus applicable to the class as a whole, [and] predominate over those issues that are subject only to individualized proof." *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir.1989). Stated another way, Plaintiffs must show not only that there are predominating questions, but also that the questions are susceptible to common proof. *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 323–24 (5th Cir.1978)[5]; *see also Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir.2009) (Certification is appropriate under Rule 23(b)(3) where "the issues in the class action that are subject to generalized proof ... predominate over those issues that are subject only to individualized proof.").

The Eleventh Circuit has offered the following guidance regarding the predominance determination:

Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief. On the other hand, common issues will not predominate over individual questions if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues. Certification is inappropriate if the plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims.

*Babineau*, 576 F.3d at 1191 (internal punctuation and citations omitted).

If common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class should not have a substantial effect on the substance or quantity of evidence offered. Put simply, if the addition of more plaintiffs to a class requires the presentation of significant amounts of new evidence, that strongly suggests that individual issues ... are important. If, on the other hand, the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs as a whole relatively undisturbed, then common issues are likely to predominate.

*Vega*, 564 F.3d at 1270 (internal punctuation omitted).

Despite the fact that Rule 23(b)(3)'s language appears to be directed to similarities within the class, one well regarded commentator has noted that "what really matters to class certification ... is primarily the opposite: not similarity at some unspecified level of generality but, rather, dissimilarity that has the capacity to undercut the prospects for joint resolution of class members' claims through a unified proceeding." Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131 (2009). Thus, in reality, "the proper inquiry for class certification" is "whether a proposed class exhibits some fatal dissimilarity." *Id.*

---

**5.** The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

"By contrast, the question of whether the class exhibits some fatal similarity—a failure of proof as to all class members on an element of their cause of action—is properly engaged as a matter of summary judgment." *Id.*; *see also Amgen*, 133 S.Ct. at 1196–97 (A "fatal similarity"—that is, an alleged failure of proof as to an element of the plaintiffs' claim—does not defeat predominance but is instead "properly addressed at trial or in a ruling on a summary judgment motion.") (citing Nagareda, *supra*).

■ The predominance requirement does not require that *every* issue in the case be susceptible of common proof. So long as "one or more of the central issues in the action are common to the class and can be said to predominate," certification is proper under Rule 23(b)(3) "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, —— U.S. ——, 136 S.Ct. 1036, 1045, 194 L.Ed.2d 124 (2016) (internal punctuation omitted); *Electrolux*, 817 F.3d at 1239 ("The 'black letter rule' recognized in every circuit is that 'individual damage calculations generally do not defeat a finding that common issues predominate.'" (quoting NEWBERG ON CLASS ACTIONS § 4.54 (5th ed.))). "[P]redominance is 'a qualitative rather than a quantitative concept. It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance.'" *Electrolux*, 817 F.3d at 1239 (quoting *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir.2014)).

### E. Effect of Intervening Class-Certification Decisions

In the more than five years that elapsed while briefing was underway on the class-certification and related evidentiary motions, the United States Supreme Court issued several decisions pertaining to class certification, including *Dukes, Comcast, Amgen*, and *Tyson Foods*. Too, the Eleventh Circuit decided cases including *Electrolux* and *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977 (11th Cir. 2016), which shed similar light on the certification analysis. The cumulative effect of these cases on class-certification standards is hotly contested by the parties in this case and among courts and commentators across the country. *See, e.g.*, Ellen Meriwether, *Comcast Corp. v. Behrend: Game Changing or Business as Usual?*, ANTITRUST, Summer 2013, at 60 (discussing the varying opinions among courts, practitioners, and commentators regarding the effect of *Dukes, Amgen*, and *Comcast*); Gregory G. Wrobel, *Perspectives on the Golden Anniversary of Modern Rule 23: Key Issues for Class Certification in Antitrust Cases*, ANTITRUST, Spring 2016, at 14 ("The topic of class actions—and class certification, in particular—is replete with divergent views not only on what the proper standards should be, but even on what the case law declares.").

Although the Court recognizes the relevance of these cases to the motions presently under advisement, it rejects the notion permeating Defendants' supplemental briefs that this recent case law broke new ground or materially altered the landscape of class certification. *See generally Comcast*, 133 S.Ct. at 1433 ("This case thus turns on the straightforward application of class-certification principles . . . ."); *Electrolux*, 817 F.3d at 1238–39 (noting that *"Comcast* did not change the law" and "did not break new ground"); *Fosbre v. Las Vegas Sands Corp.*, No. 2:10–cv–765–APG–GWF, 2015 WL 3722496, at *3 (D.Nev. June 15, 2015) (*"Comcast* . . . is not the sea change that defendants suggest."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5391159, at *5 (N.D.Cal. Sept. 19, 2013) (rejecting the defendants' argument that the standard for proving antitrust injury and damages "has somehow changed drastically under *Dukes, Comcast*, or *Amgen*"). The Court considers *Comcast, Dukes, Amgen, Tyson Foods, Electrolux*, and *Carriuolo* for precisely what they are—helpful illuminations, applications, and explanations of pre-existing law—but it declines Defendants' invitation to treat them as something they are not.

## II. *Daubert* Motions and Analysis of Offsets and Reimbursements

In support of their efforts to satisfy Rule 23, Plaintiffs rely on economist Hal Singer.

Defendants attempt to defeat certification by relying on the expert testimony of their own economists: Eric Gaier and Marius Schwartz for AirTran, and Daniel Kasper and Darin Lee for Delta. Because this expert testimony is both challenged and critical to class certification, the Court cannot grant certification without first engaging in the analysis required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1258 n. 7 (11th Cir.2014) (citing *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) (per curiam)).

The admissibility *vel non* of the challenged expert testimony turns on whether offsets (i.e., base-fare reductions) are deemed relevant and (assuming they are relevant) shown to have occurred.[6] A similar issue arises with respect to reimbursement: if a class member paid only one bag fee and was fully reimbursed for it, what effect does that have on his ability to pursue an antitrust claim? One point crystallized by recent class-certification case law is that all factual and legal questions bearing on class certification must be resolved before the class is certified, even if they go directly to the merits of the parties' claims and defenses. *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule" even if that makes it "necessary for the court to probe behind the pleadings before coming to rest on the certification question."). The significance of offsets to this case therefore cannot be put off until another day. *Cf. In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 311 (E.D.Mich.2001) (refusing at class certification to "delve into the merits of an expert's opinion or indulge 'dueling' between opposing experts" regarding the proper measure of damages in an antitrust case).

### A. Analysis of the Relevance and Existence of Offsets

According to Defendants, when the price for a checked bag was "unbundled" from base airfares, separating what once combined to form one product into two distinct ones, base fares were reduced by amounts that varied based on factors such as route, flight, fare class, and the time the ticket was purchased. Defendants assert that some class members received more in base-fare reductions than they paid in bag fees, making them "net winners" who suffered no antitrust injury at all and whose presence within the class precludes certification under Rule 23(a)(4). Even where base-fare reductions did not fully offset bag fees paid by class members, Defendants contend that the need to account for offsetting benefits precludes a finding that common evidence can be used to demonstrate antitrust injury and damages.

Plaintiffs counter that there is no evidence that base-fare reductions occurred and that even if they did, offsetting benefits are irrelevant as a matter of law in the context of horizontal price-fixing claims.

After careful consideration of the parties' arguments, the evidence of record, and legal authorities speaking to offsets, and as set forth more fully below, the Court concludes that a person suffers a cognizable injury and is impacted by a price-fixing conspiracy at the moment he pays an antitrust overcharge, even if the anticompetitive conduct at issue also results in offsetting benefits such as base-fare reductions or a reduced second-bag fee. Because of the nature of price-fixing, offsetting benefits that consumers allegedly received may not be used to reduce any damages a defendant owes for its anticompetitive conduct. And such benefits—which at most would affect only the calculation of damages—do not wipe away the antitrust injury suffered when an overcharge is paid or eliminate a person's right to bring suit to recover the full amount of that overcharge. Yet base-fare reductions or similar offsets do remain relevant—even in the context of price-fixing claims—to the Rule 23(a)(4) adequacy analysis, for they may indicate that some class members benefitted from the

---

**6.** Defendants' motion argues that Plaintiff's expert fails to appropriately account for base-fare reductions, while Plaintiffs' motions contend expert testimony regarding base-fare reductions is irrelevant as a matter of law.

challenged conduct so much that their interests are not aligned with those of other class members.

### 1. Offsets Are Irrelevant to Antitrust Injury and Damages in a Price-Fixing Claim

A horizontal price-fixing conspiracy such as the one alleged by Plaintiffs is deemed a *per se* violation of § 1 of the Sherman Act precisely because "[t]he conceivable social benefits are few in principle, small in magnitude, speculative in occurrence, and always premised on the existence of price-fixing power which is likely to be exercised adversely to the public." *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 434 n. 16, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990); *see also In re Blood Reagents Antitrust Litig.*, MDL No. 09–2081, 2015 WL 6123211, at *30 (E.D.Pa. Oct. 19, 2015) ("Mergers frequently produce pro-competitive efficiencies that outweigh their anti-competitive harm," but "[i]t is far less plausible ... that a price-fixing conspiracy would have offsetting benefits to consumers.").

As a result of the anti-competitive nature of price-fixing, courts have refused to allow defendants accused of such antitrust violations to assert claims that their unlawful conduct in some way benefitted the plaintiffs. "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226 n.59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Consequently, "mitigation and offset generally do not affect the ultimate measure of damages" in horizontal price-fixing cases. *In re Airline Ticket Comm'n Antitrust Litig.*, 918 F.Supp. 283, 286 (D.Minn.1996).[7] Instead, "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 27 (1st Cir.2015); *In re K–Dur Antitrust Litig.*, No. 01–1652, 2007 WL 5302308, at *12 (D.N.J. Jan. 2, 2007) ("[I]f the [plaintiffs] incurred an overcharge based upon the Defendants' alleged actions, they would be deemed to have suffered an antitrust injury and would be entitled to recover the full amount of the overcharge, regardless of whether they may have benefited in other ways from the Defendants' alleged actions."). And in a price-fixing conspiracy, the amount of damages is established by the amount of the overcharge. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Airline Ticket Comm'n*, 918 F.Supp. at 286.

The Eleventh Circuit has previously recognized that even a class member who is alleged to have received a net gain from a defendant's anticompetitive conduct may bring suit to recover the full amount of the overcharge:

> We do not dispute that if the defendants' [challenged conduct] illegally restrained competition, then all of the class members, including [those who were potentially net winners], would have suffered antitrust injury that is cognizable under *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968)]. In such a scenario, the [net winners in the class] would be afforded the right to sue the defendants for their alleged antitrust violations, even if they experienced a net gain ....

*Valley Drug*, 350 F.3d at 1193; *see also id.* (reiterating that even "those direct purchasers who potentially experienced a net benefit from the defendants' conduct [may] nevertheless bring[ ] suit against the defendants to recover their damages in the form of an

---

7. *See also Blue Shield of Va. v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("[A]n antitrust defendant could not relieve itself of its obligation to pay damages resulting from overcharges to a direct-purchaser plaintiff by showing that the plaintiff had passed the amount of the overcharge on to its own customers."); *Blood Reagents*, 2015 WL 6123211, at *30 ("[Defendant] cites no case in which a court required plaintiffs to account for potential decreases in the price of some products as the result of an alleged horizontal price-fixing conspiracy."); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL 1282293, at *16–17 (S.D.N.Y. Mar. 28, 2014) (alleged benefits to consumers, even those "directly related to the goods at issue," would not be used to offset or reduce any damages owed by the defendant).

overcharge"); *Hanover Shoe*, 392 U.S. at 494, 88 S.Ct. 2224 (an antitrust plaintiff in an overcharge action "proved injury and the amount of its damages ... when it proved that [the defendant] had overcharged it during the damage period and showed the amount of the overcharge," without regard to whether the plaintiff was able to pass some or all of the overcharge on to its own customers). Defendants' arguments that offsetting benefits could negate a class member's antitrust injury or damages, at least in the context of a price-fixing claim, is foreclosed by *Valley Drug. See also Nexium*, 777 F.3d at 27 (In a price-fixing case, "if a class member is overcharged, there is an injury, even if that class member suffers no damages.").

Defendants' reliance on antitrust cases involving tying theories, mergers, and lost-profits damages is misplaced, as the irrelevance of offsets stems directly from the nature of an overcharge and the rule applicable in overcharge cases that "antitrust injury occurs the moment the purchaser incurs an overcharge, whether or not that injury is later offset." *Nexium*, 777 F.3d at 27. The first-bag fee that is at the heart of this litigation is "a fungible, homogenous product embodied in a flat ... charge that is readily susceptible of being segregated from any non-homogenous aspects of Defendants' products." *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 678 (D.Kan.2004); *see also* [224-31], ¶ 6 (Delta's passenger sales accounting specialist's declaration testimony that first-bag fees are "paid at the time a passenger checks-in for his or her flight, or when the passenger checks his or her bag at the airport (either curbside, ticket counter, or at the gate)."); *cf. Blue Bird Body*, 573 F.2d at 312, 322 (Antitrust injury could not be shown using common evidence where the products involved—school buses—were not standardized but instead "differ[ed] in many respects" to "meet the individualized specifications of thousands of different" purchasers.).

The independence of the bag fee from any alleged base-fare reductions is underscored by the fact that all of Defendants' customers—even those who paid no bag fees—

would have received the benefit of base-fare reductions, assuming they occurred. The independence of the two transactions becomes even more apparent and problematic when Defendants' offset theory is applied across airlines and over time: to deny a person the right to sue for an antitrust overcharge paid to Delta in 2009 because she received a fare reduction on a 2011 AirTran flight would all but eviscerate the protections of the federal antitrust laws and *Hanover Shoe*.

Even in a price-fixing class action, however, offsets remain relevant to Rule 23(a)(4)'s adequacy criterion. *Valley Drug*, 350 F.3d at 1193–94 (If the "economic reality" is such that the benefits certain class members experienced from the challenged conduct outweighed any injury they suffered, that "may suggest a tradeoff [those class members] were content to make in order to experience" the benefits, leading to "divergent interests and objectives" and a substantial conflict of interests within the class that would defeat certification under Rule 23(a)(4).); *Pickett*, 209 F.3d at 1280–81 (reversing class certification under Rule 23(a)(4) without addressing Rule 23(b)(3) where the evidence showed that class members had antagonistic economic interests). But that is not to say that Rule 23(a) cannot be satisfied whenever some class members are alleged or even shown to have received offsetting benefits. As explained in Section III(B)(4) below, the Court is satisfied that the requirements of Rule 23(a)(4) are met in this case. Apart from that determination, offsets are of no relevance.

**2. If Offsets Were Relevant, They Would Be Relevant Only to Damages and Therefore Would Not Defeat Certification**

Even if base-fare reductions or other offsetting benefits were deemed relevant to the merits of Plaintiffs' claims and the Rule 23(b)(3) predominance inquiry, they would go at most to calculation of damages, not the fact of injury. *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1367 (9th Cir.1986) (analyzing similar offset arguments as pertaining to damages)[8]; *Cardizem CD*, 200

---

8. *See also Cardizem CD,* 200 F.R.D. at 314 ("No-

where does the court in *Los Angeles Memorial*

F.R.D. at 311–17 (conducting a detailed analysis of case law and concluding that offsets "relate to the quantum of damages; not the fact of injury"); *Elec. Books*, 2014 WL 1282293, at *17 ("[A]n antitrust defendant may not alter [the] well-settled *measurement of damages* [in antitrust price-fixing cases] by speculatively raising potential offsets, even when those offsets are directly related to the goods at issue.") (emphasis added); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 150 (S.D.N.Y.2006) (noting, in the context of a tying claim, that offsets do not defeat an antitrust plaintiff's injury but show only that he or she "suffered no economic harm").

As discussed above, the nature of price-fixing is such that it would be inappropriate to allow a defendant to rely on alleged benefits of its anticompetitive conduct to reduce any damages it owes. *Elec. Books*, 2014 WL 1282293, at *15 ("Apple is not entitled to reduce the amount of any damages that it owes because of any benefits that it claims consumers received when Apple entered the e-book market."). But even if the Court were to hold otherwise and permit Defendants to introduce evidence of offsets, such evidence, even if fully credited, would do little more than demonstrate that individual damages calculations will be necessary. "Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." *Comcast*, 133 S.Ct. at 1437 (Ginsburg and Breyer, JJ., dissenting); *Electrolux*, 817 F.3d at 1239 ("*Comcast* did not alter the black-letter rule that individual damages calculations do not always defeat predominance," although "the individual nature of the plaintiffs' damages is still relevant to whether predominance is satisfied."); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004) ("[T]hat individualized determinations are necessary to determine the extent of damages allegedly suffered by each plaintiff .... is insufficient to defeat class certification under Rule 23(b)(3)."), *abrogated in part on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008), *as recognized in Local 703*, 762 F.3d at 1253. Thus, Defendants'

*Coliseum* advance the 'no injury' argument De-

offset arguments would still prove inadequate to defeat class certification.

## B. Defendants Cannot Raise Reimbursement as a Defense

Defendants' attempts to rely on reimbursement to defeat certification are likewise to no avail. Like offsets, reimbursements would go at most to the quantum of damages, not the fact of damages, and therefore would not defeat class certification. But more importantly, Defendants' reimbursement arguments are little more than a back-door passing-on defense that is foreclosed by the Supreme Court's decisions in *Hanover Shoe* and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

Under *Hanover Shoe*, 392 U.S. at 494, 88 S.Ct. 2224, persons who pay an antitrust overcharge are entitled to recover the full amount of the overcharge even if it is shown that they recouped some or all of that overcharge from their own customers. *See also Valley Drug*, 350 F.3d at 1193 (even class members who experienced net gain have suffered cognizable antitrust injury and are entitled to sue). In other words, a defendant cannot defeat a finding that the plaintiff suffered antitrust injury and damages by showing that the plaintiff passed on the overcharge to another person or entity. *Illinois Brick* extended this logic by prohibiting "offensive" use of the pass-on defense by indirect purchasers—i.e., by denying indirect purchasers the right to bring suit to recover antitrust overcharges that were passed on to them by direct purchasers. *Illinois Brick*, 431 U.S. at 735, 97 S.Ct. 2061 ("We thus decline ... to permit offensive use of a pass-on theory against an alleged violator that could not use the same theory as a defense in an action by direct purchasers.").

Defendants accuse Plaintiffs of misapplying cases concerning the standing of indirect purchasers, and they shrewdly avoid any explicit reference to a passing-on defense. In substance, however, Defendants' reimbursement argument operates in precisely the same manner as a passing-on defense: they rely on it in an attempt to show that some

fendants assert here.'').

class members passed on all or some of their baggage fees to a reimbursing party and therefore suffered no injury, or at most, an injury that requires individual inquiry and is not suited for class certification. Whether any class members were reimbursed for any part of a baggage fee—i.e., whether they were able to pass on some portion of the alleged antitrust overcharge—is legally irrelevant and therefore will not lead to a situation in which individual questions of antitrust injury will dominate over common ones.

## C. *Daubert* Motions

The Court now turns to the substance of the parties' *Daubert* motions. Federal Rule of Evidence 702, entitled "Testimony by Expert Witnesses," provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has construed and expounded upon Rule 702's requirements in *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786, and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and has emphasized that "the inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786. District courts in the Eleventh Circuit take a three-pronged approach to resolving *Daubert* motions:

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998) (footnote omitted). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

The reliability prong requires the Court to "determine whether [the expert] used the proper methods and procedures of his discipline, and whether [the expert], in preparing his report, employed 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " *Carpenters Health & Welfare Fund v. Coca–Cola Co.*, No. 1:00–cv–2838–WBH, 2008 WL 4737173, at *2 (N.D.Ga. Mar. 14, 2008) (internal citation omitted) (quoting *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167). The primary purpose of the reliability inquiry is "to exclude 'junk science'—or . . . junk economics or junk statistics—from consideration." *Id.*; *Bullock v. Volkswagen Grp. of Am., Inc.*, 107 F.Supp.3d 1305, 1309 (M.D.Ga.2015) (noting that *Daubert* inquiries "originated over concerns about 'junk science' ").

In *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786, the Supreme Court identified four non-exclusive factors to aid courts in making the reliability assessment: (1) whether the expert's method can be and has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method; and (4) the extent to which the method is generally accepted in the relevant scientific community.[9] When analyzing reliability, "[t]he focus,

---

9. Additional factors contained in the advisory committee's notes accompanying Rule 702 include whether the expert's opinions were developed out of research independent of the litigation or expressly for the purpose of testifying, wheth-er the expert has unjustifiably extrapolated from an accepted premise to reach an unfounded conclusion, whether the expert has accounted for obvious alternative explanations, whether the expert has been as careful in his paid consulting as

of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786.

"The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir.2004). "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (internal punctuation omitted). "An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985) (quoted with approval in *Daubert*, 509 U.S. at 591, 113 S.Ct. 2786).

The Court must be wary of "excluding evidence based on skepticism as to believability," for credibility or believability is "an assessment to be made by the jury." *Bullock*, 107 F.Supp.3d at 1309; *see also Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir.2003) (*Daubert* "is not intended to supplant the adversary system or the role of the jury," and a court should not "make ultimate conclusions as to the persuasiveness of the proffered evidence."); *Tyson Foods*, 136 S.Ct. at 1049 ("Once a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury."). Any doubts regarding the credibility of or weight that should be given to otherwise reliable and relevant testimony should be addressed through "[v]igorous cross-examination, presentation of con-

trary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786.

### 1. Defendants' Motion to Exclude Singer's Class-Certification Testimony

Defendants first seek to exclude the class-certification testimony of Plaintiffs' expert economist, Hal Singer.[10] Plaintiffs rely on Singer's class-certification report [399-3], reply report [399-2], and deposition testimony [626] to satisfy Rule 23(b)(3)'s predominance requirement, which in the context of an antitrust class action requires Plaintiffs to show that the fact of damages (referred to as antitrust impact) and the amount of aggregate damages are susceptible to classwide proof. *See Terazosin Hydrochloride*, 220 F.R.D. at 694; *Domestic Air*, 137 F.R.D. at 685.[11] As to impact, Singer's opinion is that the same common proof that will be used to prove whether a violation of the antitrust laws occurred will necessarily prove whether class members were harmed, because "the payment of *any non-zero* first bag fee constitutes harm to members of the proposed class." [399-3], ¶ 78; *see also id.*, ¶ 77 ("proof of violation subsumes proof of impact").

Singer offers three different formulaic methods of calculating aggregate damages to the class. His primary methodology measures aggregate damages as "the total amount of revenue generated by Delta and AirTran in first bag fees" and individual damages as "the sum of any bag fees paid to Defendants during the class period." *Id.*, ¶¶ 88–89. This method does not account for any offsetting base-fare reductions, which Singer does not believe occurred. In rebuttal to Defendants' experts, however, Singer opines that even if offsets did occur, damages can still be calcu-

---

he would be in his regular professional work, and whether the expert's field of expertise is known to reach reliable results for the type of opinion given. *Bowers v. Norfolk S. Corp.*, 537 F.Supp.2d 1343, 1351 (M.D.Ga.2007) (citing FED. R. EVID. 702 advisory committee's note to 2000 amendment).

**10.** Defendants have also filed a motion to exclude Singer's testimony and opinions regarding the merits of Plaintiffs' claims [625]. As that

motion in no way bears on the propriety of class certification, it is not addressed in this Order.

**11.** As explained in Section III(C)(1) below, predominance also requires Plaintiffs to show that common proof will be used to prove whether Defendants violated the antitrust laws. Neither that aspect of the predominance showing nor Singer's testimony relating to it is at issue, and Singer's testimony is challenged only insofar as it speaks to impact and damages.

lated on a classwide basis using either of two alternative methodologies. [399-2], p.60.

Under each of Singer's alternative models, the total bag-fee revenue earned by Defendants is offset by what he characterizes as "the hypothetical aggregate discounts to base fares" as the result of the bag fee. *Id.*, ¶ 93. The first alternative—which the Court will refer to as the "Total-Net Methodology"—offsets Defendants' total bag-fee revenue by the reduction in base fares across all flights, even those on which no bag fee was paid.[12] The second alternative—referred to as the "Discrete-Event Methodology"—offsets Defendants' gross bag-fee revenue only by base-fare reductions "for flights on which a first bag fee was paid," treating "offsets to base fares on flights on which a bag fee was not paid [as] irrelevant." *Id.*, ¶¶ 99–100.[13]

Defendants do not challenge Singer's qualifications, and the Court finds that he is well qualified to render all of the opinions contained in his reports and testimony. Defendants do seek to exclude his testimony as both unreliable and unhelpful. In Section II(A)(1) above, the Court determined that offsetting benefits such as base-fare reductions are irrelevant to this case. As a result, Singer's two alternative methodologies—each of which purports to account for offsets—are unnecessary, unhelpful, and subject to exclusion under Rule 702 and *Daubert* without regard to reliability. After extensive review of the balance of Singer's opinions, i.e., those unrelated to base-fare reductions, the Court concludes they are admissible because Singer's methods are reliable and his opinions are relevant and likely to assist the trier of fact. Singer's primary damages methodology sets forth the most appropriate mechanism for calculating damages in the context of the horizontal price-fixing conspiracy that is alleged by Plaintiffs.

Defendants' attempts to characterize Singer's testimony as impermissible legal opinions are misplaced, as Singer never opines about how the law treats bag-fee payments, but instead formulates alternative methods of assessing injury and damages based on various hypothetical rulings on that point. *See* [626-2], p.505 (Singer's testimony that he is "certainly not opining on what the law is" but merely "offering different approaches for different possible legal outcomes"); *id.* p.504 ("there is a legal issue that I'm certainly not going to decide but the Court will decide").

Finally, the fact that Singer's damages testimony speaks only to aggregate damages is no basis to exclude his testimony as unreliable, nor is Plaintiffs' reliance on aggregates misplaced at this stage of the proceedings. "The use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself." *In re Pharm. Indus. Avg. Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir.2009). "Assuming the jury renders an aggregate judgment, allocation will become an intra-class matter accomplished pursuant to a court-approved plan of allocation, and such individual damages allocation issues are insufficient to defeat class certification." *Terazosin Hydrochloride*, 220 F.R.D. at 699; *In re Flonase Antitrust Litig.*, 284 F.R.D. 207, 233 (E.D.Pa.2012) (same); *see also In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2014 WL 6461355, at *46 (N.D.Ohio Nov. 17, 2014) ("Questions of allocation [of damages] need not definitively be resolved" at certification; the plaintiffs "must only show that they can prove classwide damages using common evidence."); *Tyson Foods*, 136 S.Ct. at 1049–50 (affirming class certification even though the damages awarded had not been distributed and the record was silent as to how the method of allocation).

---

**12.** Aggregate damages ("AD") can be calculated under the Total Net Methodology using the formula $AD = Total\_FBF - N_T * avg\_offset$, where "Total_FBF" is the total dollar amount of first-bag fees received by Defendants, "$N_T$" is the total number of flights for all of Defendants' passengers during the class period, and "avg_offset" is the average per-flight reduction in Defendants' base fares. [399-2], ¶ 98.

**13.** Aggregate damages under the Discrete-Event Methodology are calculated using the formula $AD = Total\_FBF - N_T * p * avg\_offset$, where "p" represents the percentage of passengers paying to check a bag with Defendants and the other variables are as indicated in footnote 12. *Id.*, ¶¶ 98–99.

For these reasons, Defendants' motion to exclude Singer's testimony will be granted in part and denied in part. Only those aspects of his opinions that address base-fare reductions shall be excluded.

### 2. Plaintiffs' Motions to Exclude Defendants' Expert Testimony Regarding Class Certification

■ Plaintiffs have filed *Daubert* motions to preclude testimony from AirTran's experts Eric Gaier [616] and Marius Schwartz [621] and Delta's experts Daniel Kasper [618] and Darin Lee [630]. The challenged opinions speak almost exclusively to the issue of offsetting base-fare reductions. Schwartz and Kasper discuss the mechanics of the airline industry and the economic theory supporting Defendants' claim that the introduction of the first-bag fee caused base fares to decline. Gaier and Lee expound upon those theoretical discussions by analyzing the empirical data and concluding that Defendants did reduce base fares by a statistically significant amount compared to competitors that did not charge first-bag fees. Because these experts would expect (in the case of Schwartz and Kasper) or conclude (in the case of Gaier and Lee) that base-fare reductions vary across routes, over time, and based on other factors, they opine that the predominance inquiry into impact and damages will be subsumed by highly individualized issues unique to each class member.

For the same reasons that Singer's testimony was excludable in part, any opinions by Defendants' experts pertaining to base-fare reductions, second-bag fees, or other offsetting benefits are equally unhelpful and subject to exclusion. Thus, Plaintiffs' motions will also be granted insofar as they seek to exclude testimony regarding base-fare reductions. That resolves the entirety of Plaintiffs'

motions to exclude Gaier's, Schwartz's, and Lee's opinions, which will be denied.[14] As a practical matter, of course, even though these experts' testimony will not be stricken from the record, much of it is rendered irrelevant by virtue of the Court's ruling as to offsets.

In addition to his testimony regarding base-fare reductions, Kasper further opines that "AirTran was not, and is not, Delta's primary or most important competitor," and that Delta instead "has more substantial competitive overlaps with other legacy carriers, including US Airways, American, and United." [224-3], ¶ 23. Plaintiffs seek to exclude this opinion as not tied to the facts of this case. The Court rejects this argument for two reasons. First, although the question of AirTran's influence on Delta's decision to impose a first-bag fee is relevant to the merits of Plaintiffs' claims, it has no bearing on class certification. Second, the points Plaintiffs raise in opposition to Kasper's competition opinion are matters better suited for cross-examination than a *Daubert* motion.

For these reasons, the Court will grant Plaintiffs' *Daubert* motions to exclude testimony by Gaier, Kasper, Schwartz, and Lee regarding offsetting benefits. The motion to exclude Kasper's testimony is denied insofar as it challenges Kasper's competition opinion.

### III. Analysis of Plaintiffs' Motion for Class Certification

Plaintiffs seek certification of a class consisting of "[a]ll persons or entities in the United States and its territories that directly paid Delta and/or AirTran one or more first bag fees on domestic flights from December 5, 2008 through November 1, 2014." [607], p.31.[15] The class potentially consists of more

---

14. Plaintiffs do seek to exclude portions of Schwartz's and Lee's opinions on the additional ground that they constitute impermissible legal opinions. This argument fares no better than Defendants' argument with respect to Singer's testimony. *See, e.g.,* [638-15], p.88 (Schwartz testifying "I'm not a lawyer .... I defer to the lawyers" regarding the legal effect of offsets on damages for antitrust violations). In any event, now that the Court has spoken on the legal points that are referred to in the experts' reports and testimony, there will be no need for any of

the experts to speak to or hypothesize about legal standards. But at this time, the Court need not strike any portion of the experts' testimony.

15. Plaintiffs initially proposed a class period commencing on December 5, 2008 and continuing "through the present (and continuing until the effects of Delta's and AirTran's anticompetitive conspiracy ceases)." [155], p.17. In response to Defendants' joint supplemental brief [553], Plaintiffs "have revised the class period to end on November 1, 2014 to ease administration of a

than twenty-eight million members. Tr. of 6/21/16 Hr'g at 75–76. Although ascertainability, adequacy of representation, and predominance are most in dispute, the Court will review all of Rule 23's requirements in turn to determine whether each is satisfied.

## A. The Proposed Class Is Ascertainable in an Administratively Feasible Manner Based on Objective Criteria

The Court's analysis begins with ascertainability, which is "the first essential ingredient to class treatment," *Grimes*, 264 F.R.D. at 663, and requires the class definition to contain "objective criteria that allow for class members to be identified in an administratively feasible way," *Karhu*, 621 Fed.Appx. at 946. The Court has grappled with no aspect of the class-certification analysis more than this threshold one. Ascertainability is addressed in the parties' briefs far less than the other contested Rule 23 requirements, and the inquiry is so fact-specific that judicial decisions setting forth the broad legal principles described above offer little meaningful guidance in applying them, particularly with respect to the administrative feasibility requirement. Close though the question may be, after careful review of the case law and the record, the Court is persuaded that Plaintiffs' proposed class definition is suitably ascertainable to permit certification.

In their consolidated complaint, Plaintiffs alleged that members of the class were "readily identifiable from information and records in possession of the Defendants." [53], ¶ 74. It is not enough to simply so allege; Plaintiffs bear the burden of showing that Defendants' records are *actually* useful in identifying members of the proposed class. *Karhu*, 621 Fed.Appx. at 947. Defendants contend that their records do not permit identification of class members because they identify only the passenger associated with the bag-fee transaction, which is not always

the same person as the one who actually paid the fee. Defendants also criticize Plaintiffs for having failed to conduct critical discovery into identification of class members, but Plaintiffs persuasively respond that they did do that discovery to lay the necessary foundation for their argument that Defendants' records will be useful. *See* Tr. of 6/21/16 Hr'g at 31, 67.

Every time a first-bag fee is paid to Delta, a miscellaneous accounting record ("MAR") is created that identifies the amount of the bag fee (recorded as an excess baggage charge ("EBC")), the passenger associated with the bag fee, the date the bag fee was paid, and the form of payment. If payment is made by credit card—as it must be if the bag fee is paid online or at the gate—the MAR will also identify the billing date, the credit card company, the credit card's expiration date, and an encrypted version of the credit card number that Delta is capable of unencrypting. If payment is made by cash or check, the MAR records the method of payment but does not reflect information about the source of the cash or check. A MAR may also be linked to a passenger's ticket record or passenger name record ("PNR," created when a passenger books a flight on Delta), which may contain additional identifying information such as contact information and SkyMiles account.

Payment of a first-bag fee to AirTran was recorded in a PNR, which AirTran maintained for all flight itineraries occurring during the class period. AirTran's PNR identifies the passenger name, contact information, date of birth, frequent flyer number, date of travel, and information about amounts paid for the itinerary, including base fare, taxes, first-bag fee, and other fees.[16] Like Delta's records, however, AirTran's PNR records identify the passenger name associated with the bag-fee transaction but not the identity of the individual paying the fee, if different

final resolution and in light of Southwest's sworn statement that it revoked AirTran's first bag fee on this date." [607], p.32.

**16.** At the hearing on the motion for class certification, defense counsel suggested that Plaintiffs had no evidentiary basis for their arguments regarding AirTran's documents apart from a foot-

note in Delta's brief that was unsupported by affidavits or other evidence. *See* Tr. of 6/21/16 Hr'g at 35. Not so. By way of example, AirTran's expert Eric Gaier speaks to the content of AirTran's records in both his class-certification and merits opinions. *See* [638-1], ¶¶ 78–79; [403-15], ¶ 18.

from the passenger. Unlike Delta, AirTran's bag-fee payments were processed by a third-party vendor, Navitaire, whose records include additional identifying information such as encrypted credit card numbers and the name of the cardholder. The foregoing demonstrates that while Defendants' records might not allow for a one-step identification of first-bag-fee payors, they undoubtedly contain information that is "useful for identification purposes," *Karhu*, 621 Fed.Appx. at 948, particularly when that information is cross-referenced with information in the possession of third parties such as Navitaire.[17]

In addition, Plaintiffs have shown that class members' own records—such as receipts and bank or credit-card statements—and self-identification affidavits can be used to further aid identification of class members in a feasible manner. To the extent class members retained receipts or credit card statements documenting payment of a first-bag fee—as each of the named Plaintiffs did, *see, e.g.*, [607-6–607-14]—these objective records can be used to permit self-identification of class members in a reliable manner. *See Karhu*, 621 Fed.Appx. at 948–49 (noting various problems of self-identification-based ascertainment, none of which is implicated where the self-selection is supported by objective records confirming class membership); *Byrd*, 784 F.3d at 170 (self-identification through affidavits permissible when accompanied by methodology to verify class membership); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir.2012) (Where district court permits self-identification, affidavits should be accompanied by "further indicia of reliability" so that defendant does not have to merely "accept as true

absent persons' declarations that they are members of the class.").

The Court is cognizant of the concerns raised by self-identification, but in a case such as this, where the charge at issue is so small that it is unlikely to induce fraudulent claims and class members can obtain objective records with relative ease that would confirm their membership in the class, those concerns are minimized. In any event, as the process for submitting and confirming class members' claims is further developed, the Court (and no doubt Defendants) will remain vigilant that the process be structured in a manner to eliminate as much of the uncertainty as possible.

The purported confusion among class members that Defendants point to is not of the sort that should prevent self-identification. In *Randolph v. J.M. Smucker Co.*, 303 F.R.D. 679, 689 (S.D.Fla.2014), for example, class members were not ascertainable because they would have to recall the specific variety of cooking oil that they purchased, and the cooking oil itself was merely "an additive ingredient to a final product, rather than a final product directly consumed by the user." It was therefore unlikely that class members would remember the necessary information, and that information was not readily available from objective records such as sales receipts, which would not show the specific variety of oil that had been purchased. Here, conversely, the combination of objective records, Defendants' records, and Plaintiffs' own recollections regarding their travel make this case better suited for self-identification, albeit through a carefully tailored claims-administration process.

---

**17.** The Court further observes that the identical argument raised by Defendants in this case has been previously made and rejected by this Court. In *Domestic Air Transportation*, 137 F.R.D. at 696, the court certified a class of ticket purchasers and rejected the defendants' argument that their records allowed only for the identification of passengers, not purchasers. Judge Shoob explained in a subsequent order that "when the Court requested from each side, on the eve of class certification, a preliminary plan for the administration of claims," the defendants "did an about face concerning identification of class members" and conceded "that their records contain sufficient information that, combined with

databases of third parties, will provide names and addresses for some individuals who purchased tickets on class flights." *In re Domestic Air Transp. Litig.*, 141 F.R.D. 534, 540 (N.D.Ga. 1992) (*"Domestic Air II"*). This Court is not alone in rejecting this type of argument. *See Midwestern Mach. v. Nw. Airlines, Inc.*, 211 F.R.D. 562, 565, 569 (D.Minn.2001) (When airline customers sought certification of a class of "persons who purchased tickets" for air travel, airline's argument that "the passenger and the purchaser of a ticket are not always the same person" was a complexity that impacted "the method of notice rather than the issue of whether certification should be granted.").

The fact that some review of files and submissions will be required does not defeat certification; otherwise, Defendants in this case and others "could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained." *Young*, 693 F.3d at 540; *see also Byrd*, 784 F.3d at 170 ("There will always be some level of inquiry required to verify that a person is a member of a class."). But at this stage of the proceedings, Plaintiffs have carried their burden of demonstrating that there is an administratively feasible way to identify class members using objective criteria. Ascertainability is therefore no bar to class certification.

### B. Rule 23(a) Requirements

Having determined that the "first essential ingredient to class treatment" is satisfied in this case, *Grimes*, 264 F.R.D. at 663, the Court now turns to Rule 23(a)'s four criteria: numerosity, commonality, typicality, and adequacy of representation. Defendants primarily challenge the last requirement—adequacy of representation—but they also raise some arguments pertaining to commonality and typicality. The Court will examine each element to ensure it is satisfied. *Comcast*, 133 S.Ct. at 1432 ("[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.") (internal punctuation omitted); *Valley Drug*, 350 F.3d at 1188 (noting that a court must "conduct[ ] its own inquiry" to ensure that all of Rule 23's requirements are satisfied).

### 1. Numerosity

The proposed class in this case consists of all persons who paid at least one first-bag fee during the class period of almost six years. Defendants' records reflect tens of millions of first-bag fee transactions during that time period, and even though the number of class members will be less than the total number of bag-fee payments because some class members will have incurred more than one bag fee, there is no dispute that the class members will number in the millions. *See, e.g.*, [401-3] (declaration of Delta's expert Darin Lee estimating the class to consist of between twenty-eight and fifty-seven million

people as of September 2013). These class members are so numerous and geographically dispersed that joinder is certainly impracticable.

In the Eleventh Circuit, a prospective class with more than forty members is generally deemed to satisfy the numerosity requirement. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.1986). But the plaintiffs "need not prove the exact size of the proposed class"; rather, they "need demonstrate only that the number is exceedingly large, and joinder impracticable." *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 679 (S.D.Fla.2012). The Court easily finds that the proposed class satisfies Rule 23(a)(1)'s numerosity requirement.

### 2. Commonality

Rule 23(a)(2) requires Plaintiffs to show, as a prerequisite to class certification, that "there are questions of law or fact common to the class." What the commonality requirement really looks to "is not the raising of common 'questions' . . . but rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350, 131 S.Ct. 2541 (internal punctuation omitted). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* (quoting *Falcon*, 457 U.S. at 157, 102 S.Ct. 2364). More precisely,

> [t]heir claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Id.*

"The threshold finding for commonality under this section is qualitative rather than quantitative." *Terazosin Hydrochloride*, 220 F.R.D. at 685. Thus, the commonality requirement "does not require that all the questions of law and fact raised by the dispute be common or that the common questions of law or fact predominate over individual issues." *Vega*, 564 F.3d at 1268 (internal

punctuation and citation omitted).[18] Indeed, "[f]or purposes of Rule 23(a)(2) even a single common question will do." *Carriuolo*, 2016 WL 2870025, at *3 (quoting *Dukes*, 564 U.S. at 359, 131 S.Ct. 2541). The Eleventh Circuit has described this as a "low hurdle" to overcome. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir.2009). "Specifically in the antitrust context, courts in this Circuit have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact." *Terazosin Hydrochloride*, 220 F.R.D. at 686; *accord Fla. Cement*, 278 F.R.D. at 679 ("In cases containing allegations of price-fixing, courts have consistently held that the nature of the antitrust conspiracy action compels a finding that common questions of fact and law exist.").

 This case presents no exception. The claims of each and every class member will necessarily turn on common questions including those going to the existence, means, scope, and duration of the alleged conspiracy between Delta and AirTran. *See Blue Bird Body*, 573 F.2d at 319 n. 22 (approving of the district court's conclusion that "while questions not common to all may arise, there are common questions of law or fact … as required" by Rule 23(a)(2), including the "obvious" question of "the very existence of a conspiracy among the Defendants"); *Fla. Cement*, 278 F.R.D. at 679–80 (Common questions in price-fixing cases included, without limitation, "questions such as whether the Defendants conspired to fix the prices …, the identity of each member in the conspiracy, and the time period during which the conspiracy existed," and requiring class members to "prove identical elements" through individual actions "would completely destroy any notions of judicial economy."); *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 612 (N.D.Ga.1997) ("Typically, questions concerning the existence and scope of an alleged conspiracy will satisfy the commonality requirement.").

The only argument presented against finding that commonality exists in this case is Delta's suggestion—in a footnote—that "[t]he typicality or commonality requirements of Rule 23(a) also are not satisfied when some members of the proposed class benefitted [from the allegedly unlawful conduct] and others did not." [221], p.26 n.21. As mentioned above, the Eleventh Circuit has consistently treated this argument as relevant to Rule 23(a)(4)'s adequacy requirement. *Pickett*, 209 F.3d at 1280; *Valley Drug*, 350 F.3d at 1189. Delta cites no legal authorities analyzing an offset argument in the context of commonality or typicality. Even if some class members might have benefitted from the unbundling of bag fees and base fares—and as set forth in Section II(A) above, the Court finds Defendants' arguments in this regard unpersuasive—that has no effect on the Court's conclusion that there are many questions of law or fact common to the class such that the commonality requirement is satisfied here.

### 3. Typicality

 As with commonality, it is undisputed that Rule 23(a)(3)'s typicality requirement is satisfied in this case, and for good reason. The claims of all class members, including the named Plaintiffs, "arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984). Where there is no variation in the legal theory asserted by the class members and the named Plaintiffs, the fact that some "plaintiffs may have suffered greater damage than other passengers … does not render them atypical." *Id.*; *see also Williams*, 568 F.3d at 1356–57 (named plaintiffs' claims regarding employer's hiring of illegal aliens were not atypical despite factual variations regarding locations in which the named plaintiffs worked); *Domestic Air*, 137 F.R.D. at 698–99 (Typicality requirement was "easily met" where all claims "stem[med] from the same legal theory" despite the fact that "members of the class purchased many [airline] tickets at different prices according to varying conditions."). The Court has no doubt that Plaintiffs' claims are typical of the class.

---

**18.** As described below, Plaintiffs must still demonstrate that common issues predominate, but this requirement is addressed in Rule 23(b)(3), not Rule 23(a)(2).

### 4. Adequacy of Representation

Having concluded that the largely undisputed components of Rule 23(a) are in fact satisfied, the Court now turns to the adequacy requirement, which is very much in dispute. Plaintiffs can satisfy Rule 23(a)(4) only if they show that no fundamental conflict of interest exists among class members.[19]

Defendants contend that Plaintiffs cannot adequately represent a class that consists of net winners and net losers. Although the Court has deemed the existence of base-fare reductions and similar offsets irrelevant to the question of a class member's antitrust injury and damages, it remains very much relevant to the adequacy-of-representation requirement. *Id.*; *Pickett*, 209 F.3d at 1280. Relevant though it may be, however, the Court easily concludes that in this case no fundamental conflict exists between Plaintiffs and the class members they seek to represent.[20]

As set forth above, even if the evidence did suggest the existence of offsetting benefits to class members, such benefits have been held to defeat an adequacy showing only in cases in which the benefits were so significant and apparent that the class members receiving them effectively had no incentive to see the challenged practice(s) declared unlawful. For example, in *Pickett*, 209 F.3d at 1280, a class of cattle producers alleged that certain types of contracts for purchasing cattle violated the federal antitrust laws, but the class "include[d] producers who willingly entered into" the very contracts that were at issue. Under such circumstances, "the [p]laintiffs could not possibly provide adequate representation" to the whole class. *Id.*

Similarly, in *Valley Drug*, 350 F.3d at 1193–94, the class was represented by two regional pharmaceutical wholesalers, while the three national wholesalers with the bulk of the antitrust claims had allegedly experienced a net gain from the conduct at issue and had chosen not to bring suit on their own, suggesting a sharp misalignment of economic interests between the regional and national wholesalers. The court further noted that the national wholesalers were "sophisticated businesses that [were] more than capable of bringing suit on their own behalf" if they desired to do so. *Id.* at 1194 n. 20.

The facts of *Valley Drug* and *Pickett* stand in contrast to those of this case because there the conflict was substantial enough to suggest "divergent interests and objectives" among the class members. *Valley Drug*, 350 F.3d at 1193. That is not the case where, as here, any base-fare reductions were *de minimis* and at best incidental to the antitrust overcharge to which Plaintiffs claim they were subjected. Defendants' own experts and counsel employ hypothetical base-fare reductions of approximately ten dollars. *See* [224-4], ¶ 10 (Darin Lee hypothesizing about base fare reductions on four flights in the amounts of $2.50, $5, $7.50, and $10); [399-1], p.20 (AirTran's counsel hypothesizing in a brief that "if the average base for a flight was $200 before bag fees, the average base fare may have declined to $190 after bag fees."). Unlike in *Valley Drug*, 350 F.3d at 1193, there is no suggestion in the case at hand that

---

19. As to the second showing that must be made to satisfy Rule 23(a)(4), the Court has no doubt that Plaintiffs' counsel will continue to adequately prosecute the action as they have done in the six years since they were appointed interim lead counsel in January 2010.

20. The Court rejects Plaintiffs' argument that Defendants are barred from raising this defense because they failed to plead the defense of set-off in their answers. Despite the similar nomenclature, the argument raised by Defendants regarding offsets and benefits inuring to class members is not a true setoff defense. *See United States v. Finch*, 239 F.R.D. 661, 663 (S.D.Ala.2006); *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). Defendants do not seek to recoup money from Plaintiffs; they

simply contend that any injury or damages suffered by Plaintiffs should account for the benefits Plaintiffs allegedly received. Furthermore, although the Court holds that Defendants were not obligated to raise their offset argument in their answers, even if that were not the case, the reference in Delta's answer to the preclusive effect of reimbursement, *see* [147], p.2, and AirTran's incorporation by reference of "all ... defenses asserted by other defendants," [146], p.20, is sufficient to put Plaintiffs on notice that Defendants intended to challenge the fact or amount of Plaintiffs' claimed damages and injury. *See generally Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev't Corp., S.A.*, 711 F.2d 989, 995 (11th Cir.1983) (antitrust cases subject to notice pleading requirements).

class members were subjectively aware of any offsetting benefits, let alone that they could be said to have been "content" to make a "tradeoff" in the form of being subjected to a first-bag fee to receive those benefits. Indeed, the evidence shows that the benefits, assuming they existed at all, would have been equally available to class members who did not pay a bag fee. The class members here have also not been shown to have a greater-than-average level of sophistication, which further cautions against finding a conflict of interest under the facts of this case. *Cf. id.* at 1194 (describing potential net winners as "sophisticated class members whose actual economic interests significantly diverge from the named representatives").

Any benefit that class members might have received is at most a "minor conflict" that "will not defeat a ... claim to class certification." *Id.* at 1189. This conflict, if one existed, is not so fundamental that it would prevent Plaintiffs from vigorously prosecuting the interests of the class through qualified counsel. *See Carriuolo*, 2016 WL 2870025, at *8 (potential differences among class members in amounts of damages, levels of sophistication and access to information, and ability to lease or resale product at issue before the defect was corrected were not so fundamental as to preclude certification); *Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491, 500 (N.D.Ga.2006) ("Even assuming" that some class members "received a net benefit" from Defendants' challenged conduct, such a conflict "is insufficient to rise to the level of a fundamental conflict"); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y.1996) ("Even if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class.").

AirTran also argues that Plaintiffs cannot adequately represent the class because conflicts between them and the class members exist with respect to proof of the alleged conspiracy. Specifically, AirTran argues that class members cannot align around a conspiracy in which Defendants raised their first-bag fees at different times and in different amounts. AirTran contends that the varying increases make it improbable that the class members share a common theory of antitrust liability. AirTran does not provide any case or statutory law to support its contention, and the Court does not find it persuasive. Accordingly, this argument does not defeat Plaintiffs' motion.

Thus, the Court holds that Plaintiffs have satisfied all four criteria of Rule 23(a), including the adequacy-of-representation requirement, and now turns to Plaintiffs' arguments with respect to subsection (b).

## C. Rule 23(b)

As mentioned above, Plaintiffs can obtain class certification only if they satisfy both Rule 23(a) and one of the three prongs of Rule 23(b). *Vega*, 564 F.3d at 1265. There is no dispute here that subsection (b)(3) is the only potentially applicable prong.

In order for subsection (b)(3) to apply, Plaintiffs must show that (1) common questions of law and fact predominate over individual issues, and (2) a class action is superior to other available methods of adjudication. *See Vega*, 564 F.3d at 1265; *Domestic Air*, 137 F.R.D. at 684. Of these two requirements, Defendants vehemently challenge the predominance requirement. As stated above, Plaintiffs need not prove that they will prevail on the merits in order to obtain certification under subsection (b)(3). *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971). But the Supreme Court has made clear that the rigorous analysis of Rule 23(a) required by *Dukes* applies with equal—if not greater—force to Rule 23(b)(3). *Comcast*, 133 S.Ct. at 1432 ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).").

### 1. Predominance

■ The predominance inquiry begins by identifying the nature and elements of the parties' claims and defenses. *Electrolux*, 817 F.3d at 1234. Plaintiffs allege that Defendants violated § 1 of the Sherman Act, and they seek relief under § 4 of the Clayton Act. The legal framework governing the predominance analysis in such a case is well settled:

To recover treble damages under [§ 4], plaintiffs must prove (1) that defendants violated the antitrust laws; (2) that the alleged violations caused plaintiffs to suffer some injury . . . ; and (3) that the extent of this injury can be quantified with requisite precision. Plaintiffs' burden is to establish that common or "generalized proof" will predominate at trial with respect to these three essential elements of their antitrust claim.

*Domestic Air*, 137 F.R.D. at 685 (internal citation and punctuation omitted); *accord Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 556 (N.D.Ga.2007).

Plaintiffs first must prove that they can establish by common evidence whether Defendants violated the antitrust laws. This is not in dispute. The evidence pertaining to the existence of the price-fixing conspiracy will inevitably focus on Defendants' conduct and communications and will not vary among class members; thus, the addition or subtraction of any class members will have no effect on either the substance or quality of the evidence offered in this regard. *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 344 (D.Md.2012); *Polypropylene Carpet*, 178 F.R.D. at 619 ("Generally, common proof of the existence of a price-fixing conspiracy will predominate at trial if the plaintiffs plan to rely upon evidence of the defendants' conduct, rather than the conduct of individual class members."). Significantly, "at this stage of the proceedings, the Court does not inquire *whether* Plaintiffs can prove the existence of a conspiracy, but *how* Plaintiffs will prove the existence of a conspiracy at trial." *Polypropylene Carpet*, 178 F.R.D. at 619. The record evidence satisfies the Court that the existence *vel non* of "a single price-fixing conspiracy will be proven predominantly by evidence that is common to all class members." *Id.* at 620. The first element of the

predominance showing is therefore satisfied, and the Court turns to Defendants' arguments that individual issues dominate the injury and damages elements of Plaintiffs' claim, and as a result these elements cannot be established with common proof.

"The fact of injury or 'impact' is an essential element of the antitrust claims that requires proof that [the class members] suffered some injury that was caused by Defendants' antitrust violations." *Terazosin Hydrochloride*, 220 F.R.D. at 696 (citing *Martino v. McDonald's Sys., Inc.*, 86 F.R.D. 145, 147 (N.D.Ill.1980) ("Fact of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief.")); *see also Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 106 (2d Cir.2007) ("[A]ntitrust injury" required to prevail under § 4 of the Clayton Act is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.").

"Proof of 'impact' is not only essential to demonstrating defendants' liability under the antitrust laws, it is also the key element in determining whether common issues will predominate." *Domestic Air*, 137 F.R.D. at 689.

> [F]or purposes of determining whether to certify a class, the 'impact' element of an antitrust claim need not be established as to each and every class member; rather, it is enough if the plaintiffs' proposed method of proof promises to establish 'widespread injury to the class' as a result of the defendant's antitrust violation.

*In re Nw. Airlines Corp.*, 208 F.R.D. 174, 223 (E.D.Mich.2002) (quoting *NASDAQ Market-Makers*, 169 F.R.D. at 523).[21]

---

**21.** Delta cites *Shumate & Co. v. National Association of Securities Dealers, Inc.*, 509 F.2d 147, 155 (5th Cir.1975), for the proposition that "proof of injury to business or property of each class member is critical for the determination of defendants' liability to any individual." Not so. *Shumate* was not an overcharge case, but one in which the plaintiffs alleged that the defendants had conspired to deprive them of business opportunities. The court expressly observed, *id.* that such a case "is different from one where liability

can be shown as to all class members, with only the amount of damage to be determined as to each." *See also Fradette v. Am. Serv. Corp.*, No. 76–6373–Civ–CA, 1979 WL 1756, at *7 (S.D.Fla. 1979) (Antitrust actions "seeking damages for exclusions of plaintiffs from opportunities to do business . . . produce impact and proof problems unlike those inherent in cases involving market distortions of purchases of goods or services."); *Campus Cleaners, Inc. v. Dallas Tailor & Laundry*

Delta contends that the imposition of a first-bag fee did not have the same effect on all proposed class members—such as those who paid less in first-bag fees than they received in base-fare reductions, class members who checked two bags,[22] and class members who were reimbursed for their travel expenses—and proving the fact of injury will thus depend on individualized issues unique to each class member. AirTran argues that common proof of impact cannot be shown by common evidence because the alleged conspiracy affected only the first-bag fee, which is but one element of the total ticket price, and the total price paid by class members for air travel are affected by individual factors such as route, flight, carrier, and date of purchase. The Court has already rejected Defendants' offset and reimbursement arguments, which are insufficient to defeat a finding of predominance as to antitrust impact and damages. The Court has also rejected Defendants' attempts to liken this case to those involving tying claims, noting that the first-bag fee is an isolated product that is distinct from the purchase of airfare. *See* Section II(A)(1) above.

Several courts have rejected predominance arguments similar to those made by Delta and AirTran and have certified classes under subsection (b)(3) when presented with facts similar to those in this case. *See Domestic Air*, 137 F.R.D. at 689–92 (rejecting argument that "because of the nonstandardized nature of the airline industry and the variety of competitive factors that may affect a specific sale, proof of injury must be established on a sale-by-sale basis"); *Nw. Airlines*, 208 F.R.D. at 222–23 (rejecting the defendants' attempt to show that "the 'but-for' world would be a great deal more complicated, with a great deal more variation in the airlines' market-by-market responses, than posited by Plaintiffs' experts," noting that the plaintiffs'

"antitrust claims will rise or fall with the trier of fact's acceptance or rejection of their" argument and all that mattered at class certification is that their theory of liability rest upon "a colorable analytical method that is susceptible to generalized proof"); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04–cv–3066–JEC, 2009 WL 856306, at *9–10 (N.D.Ga. Feb. 9, 2009) [hereinafter *Columbus Drywall II*] (even where prices were indisputably subjected to individualized negotiations, classwide impact could be shown by showing that the starting price for the negotiations was artificially increased); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 263–64 (D.D.C.2002) (holding that predominance was satisfied even where "class members purchased widely different products in completely unrelated markets"); *Midwestern Mach.*, 211 F.R.D. at 571–72 (rejecting similar arguments as pertaining only to damages).

"Antitrust actions involving allegations of price-fixing have frequently [been] held to predominate in the class certification analysis." *Vitamins*, 209 F.R.D. at 262–63 (collecting cases). Here, analysis and evaluation of Plaintiffs' proposed proof that Defendants conspired to impose the first-bag fee and that the resulting antitrust violation impacted the class "will be done once for the benefit of the class and not repeatedly for each individual member." *Midwestern Mach.*, 211 F.R.D. at 572. While Defendants' arguments are "superficially successful at deconstructing Plaintiffs' proposed method of proof so as to make it appear uniquely complex and incapable of common proof, it is ultimately an exaggeration and insufficient to defeat Plaintiffs' claim of predominance." *Id.* at 571. "Simply because an industry involves an elaborate pricing system that results in a range of prices . . . is an insufficient reason for denying class certification." *Id.* at 572.

---

*Supply*, No. 76–H–35, 1977 WL 1490, at *10 (S.D.Tex. Sept. 2, 1977) (distinguishing *Shumate* and noting that in the context of price-fixing conspiracies, "proving the fact of injury is a simple matter of looking at the business records to see who purchased at the supracompetitive prices").

**22.** When Delta introduced its $15 first-bag fee, it reduced its second-bag fee from $50 to $25,

lowering by $10 the total cost ($40) to a passenger checking two bags. The Court is not convinced that this purported benefit is any different from the fare-reduction and reimbursement arguments rejected above. But like those other arguments, the second-bag-fee benefit is relevant (if at all) only to the calculation of individual damages, not the fact of injury, and therefore does not defeat certification.

As for damages, Plaintiffs' theory of damages—Singer's primary methodology—is tied to the legal theory supporting their claims, and all plaintiffs allege an identical harm, making it likely that damages can be proven through common evidence. *Cf. Comcast*, 133 S.Ct. at 1433–34 (certification improper where plaintiffs' damages model "failed to measure damages resulting from the particular antitrust injury" alleged); *see also Cathode Ray*, 2013 WL 5391159 at *7 ("A 'method' for measuring damages is … not enough—it needs to be 'the method' in relation to the theory of liability the plaintiffs assert.").

This is not to say that individual issues will not arise. It is likely "inevitable that individualized proof will be presented," but such proof "will only be relevant with respect to the calculation of damages." *Midwestern Mach.*, 211 F.R.D. at 572. "[T]he fact that there will necessarily be individualized damages evidence does not preclude Rule 23(b)(3) certification." *Columbus Drywall II*, 2009 WL 856306, at *10. That is especially true where, as here, any individualized damages issues cannot reasonably be expected to be "accompanied by significant individualized questions going to liability" and computation of damages is unlikely to be "so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable." *Electrolux*, 817 F.3d at 1240 (internal punctuation omitted). If Plaintiffs prevail on their claim, their damages will be determined in a formulaic manner based on the amount of overcharges paid by class members. *Klay*, 382 F.3d at 1259–60. To permit damages questions to preclude certification under these circumstances would effectively "eliminate antitrust class actions." *Nw. Airlines*, 208 F.R.D. at 224; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir.2013) ("It would drive a stake through the heart of the class action device … to require that every member of the class have identical damages."). The Court concludes that Plaintiffs have shown that common questions predominate over individual issues as to both antitrust impact and damages.

The parties' submissions and the record evidence lead to the conclusion that common questions predominate over individual ones and the class-action vehicle can be expected to "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Electrolux*, 817 F.3d at 1235. Accordingly, Plaintiffs have carried their burden on the predominance inquiry with respect to all three elements of their antitrust claim. *See Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1579 (11th Cir.1983) ("Once an antitrust violation and its causal relation to plaintiff's injury have been established, the burden of proving the amount of damages is much less severe.").

## 2. Superiority

■ "In addition to finding that common questions predominate over individual inquiries, in certifying a class under Rule 23(b)(3), the Court must find that the class action vehicle is superior to other available methods for adjudication." *Domestic Air*, 137 F.R.D. at 693.

Among the factors relevant to the superiority requirement are these:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

*Carriuolo*, 2016 WL 2870025, at *8 (quoting FED. R. CIV. P. 23(b)(3)). Plaintiffs have put forth compelling and persuasive arguments that the first three of these factors weigh in favor of certification—*see* [155], pp.33–34—and neither Defendant contests those arguments.

The Court finds that the fourth factor, which looks to manageability of the class action, is also satisfied. Even if "the number of plaintiffs makes the proceeding complex or difficult," this alone is not a reason to deny

certification. *Domestic Air*, 137 F.R.D. at 693; *accord In re Conagra Peanut Butter Prods. Liab. Litig.*, 251 F.R.D. 689, 699 (N.D.Ga.2008) ("Certification should not be denied for lack of superiority solely because a class action would make a district court's task complex or difficult."). "Instead, the focus is on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Conagra Peanut Butter*, 251 F.R.D. at 699 (internal punctuation omitted). Where, as here, the class members' claims are "so small that the cost of individual litigation would be far greater than the value of those claims," the class-action vehicle is superior to other forms of litigation available to Plaintiffs, and class certification is appropriate. *Domestic Air*, 137 F.R.D. at 693–94; *Carriuolo*, 2016 WL 2870025 at *8.

AirTran contends that inquiries with respect to individual class members will "devolve into numerous mini-trials, rendering this case unmanageable," citing *Rodney v. Northwest Airlines, Inc.*, 146 Fed.Appx. 783 (6th Cir.2005). In *Rodney*, however, the court affirmed the district court's determination that Rule 23(b)(3)'s predominance requirement was not satisfied, and it therefore did not reach the question of superiority. Here, for the same reasons the Court has already found that individual inquiries do not defeat a finding of predominance, the Court finds too that the superiority requirement is satisfied in this case and that a class action is the only fair method of adjudication for Plaintiffs and the other class members. *See generally Polypropylene Carpet*, 178 F.R.D. at 625 (applying factors in Rule 23(b)(3)(A)–(D) in the context of antitrust claims and finding that "the class action procedure is superior to other available methods for the fair and efficient adjudication of the controversy").

## IV. Conclusion

For the foregoing reasons, the parties' Daubert motions [399, 616, 618, 621, 630] are granted insofar as they seek to exclude testimony or opinions regarding offsetting benefits but denied in all other respects. Plaintiffs' motion for class certification [123] is granted, and it is hereby ordered pursuant to Rule 23(g) that interim class counsel be and hereby are appointed as class counsel.

IT IS SO ORDERED this 12th of July, 2016.